UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| AHC Holdings, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>MSU Health Care, Inc.<br><br>and<br><br>Roger Jansen,<br><br>    Defendants. | Case No. |

**COMPLAINT**

1. This action arises out of MSU Health Care, Inc.'s (the "Company") campaign to destroy AHC Holdings, Inc. f/k/a Assure Health Corporation ("Assure") in retaliation for Assure refusing to pay kickbacks to the Company's Chief Digital & Innovation Officer, Roger Jansen. Jansen was so incensed that Assure refused to join the pay-to-play scheme that he intentionally sabotaged Assure's Series A fundraising round and tanked Assure by lying to venture capital firms and other key players in the healthcare industry, falsely telling them that the Company was about to terminate Assure's contract because Assure had committed widespread Medicare fraud and had major compliance issues.

2. Defendants' lies wiped out $48.5 million in Assure's enterprise value, caused tens of millions of dollars in reputational harm, and resulted in substantial out-of-pocket expenses to remedy the defamation.

{04221418 v1}

# PARTIES

3. Plaintiff AHC Holdings, Inc. f/k/a Assure Health Corporation is a Delaware corporation. At all times relevant to this complaint, its name was Assure Health Corporation and its principal place of business was in Lauderdale Lakes, Florida. Currently, its principal place of business is in Palm Beach County, Florida, and its name was changed with the Delaware Secretary of State to AHC Holdings, Inc. Beginning in October 2021, Assure partnered with the Company in East Lansing, Michigan to provide remote patient monitoring services to the Company and its patients.

4. Defendant MSU Health Care, Inc. is a Michigan corporation with its principal place of business in East Lansing, Michigan. It has no parent corporation.

5. At all times relevant to this complaint, Defendant Roger Jansen was employed by the Company in a C-level role and was acting within the scope of his employment at the Company. Roger Jansen's title changed over the course of his employment with MSU Health Care, Inc. At all times relevant to this complaint, Jansen was either the Company's Chief Digital & Innovation Officer or its Chief Strategic Growth and Digital Health Officer. Jansen is domiciled in Michigan.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because Assure is a citizen of a different state than the Defendants and the amount in controversy exceeds $75,000.

7. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district.

8. This Court has personal jurisdiction over the Defendants because both Defendants are domiciled in Michigan.

## FACTUAL ALLEGATIONS

### *Assure sought a partnership with the Company*

9. Assure was founded in 2020 to provide patients with better and more affordable access to healthcare with easy-to-use technology that allows physicians to remotely monitor their patients' health metrics and manage chronic diseases.

10. In April 2021, Assure and Higi SH LLC ("Higi")—acting through their wholly owned subsidiaries, Assure Health Ventures, LLC and Higi Health Holdings, LLC, respectively—entered a joint venture relationship under which Assure provided its remote monitoring services for patients and Higi marketed Assure's services to clients within its network.  Higi and Assure formed a joint venture entity called Higi Health, LLC, which is now known as Assure Health Care Everyday, LLC (the "JV"), as well as a medical practice entity managed by the JV called Higi Care Network (DE), P.A. (the "Practice").  Effectively, the JV and the Practice functioned as pass-through entities, with services provided by Assure, Higi, and their respective subsidiaries and affiliates on a subcontracted basis.

11. In June 2021, Assure met the Company's Chief Strategic Growth and Digital Health Officer, Roger Jansen, and they began discussions about Assure providing its services to the Company and its patients.

### *Jansen used his position at the Company to pressure Assure into paying him kickbacks*

12. While Assure saw its introduction to Jansen as an opportunity to expand and provide its innovative monitoring services to a larger group of patients, Jansen saw it as an opportunity for his own personal gain.

13. Shortly after Assure and Jansen began discussing the potential for a contractual relationship with the Company, Jansen approached Assure's CEO with an offer to help facilitate ongoing commercial and contractual relationships between the Company and Assure and to further

3

use his position at the Company to generate additional partnerships and business for Assure. In exchange, Jansen demanded that Assure compensate him with cash, commission, and equity in Assure.

14. In August 2021, Jansen put his demands in writing, sending an email to Assure's CEO requesting a monthly stipend of $15,000, a 1.5% cash commission, 3-6% equity in Assure, and additional cash compensation based on undetermined performance metrics.

15. Assure initially entertained Jansen's demands, believing that he would not have made them if they were illegal, particularly because Jansen projected a public persona as an executive who decried the corruption and inflated salaries endemic to the U.S. healthcare system. On his LinkedIn page, for example, Jansen consistently lambasted hospital executives and boards for shirking their duties as stewards of the community and instead using their positions to grow their own personal wealth.

16. After receiving Jansen's email, Assure let Jansen know that it would need to evaluate and discuss his demands internally and would get back to him.

17. As the months went by, Jansen started inundating Assure's CEO and COO with demands: In a set of texts to Assure's CEO and COO, Jansen claimed that he was adding significant value to Assure but that Assure was not returning the favor by providing "value" to him. Jansen then made it clear that unless Assure paid him off with at least equity, he would no longer facilitate the consummation of a partnership between Assure and the Company.

18. Jansen followed those texts with an email to Assure, again demanding a *quid pro quo*: 3% equity in Assure in exchange for securing a deal between Assure and the Company and other unspecified "value" that Jansen said he would provide.

19. In late December 2021, Higi advised Assure not to trust Jansen and revealed that

Jansen had already managed to extract compensation and equity from Higi related to other business that Higi—not the JV—was engaged in with the Company.

20. After learning that Jansen's demands were illegal, Assure informed Jansen that it would not give him equity in Assure or acquiesce to any of Jansen's other demands for compensation.

*Assure's successful partnership with the Company attracted the attention of venture capital firms*

21. In March 2022, the JV finalized a contract with the Company. After the JV's work for the Company officially launched in July, Assure was able to penetrate the commercial market and grow substantially.

22. Assure was then able to acquire Higi Health Holdings, LLC's 51% interest in the JV, giving Assure full ownership of the JV and full non-clinical management control of the Practice (through its wholly-owned subsidiaries Care Everyday Acquisition Vehicle, LLC and Assure Health Ventures, LLC).

23. Thereafter, Assure attracted the attention of venture capital firms and began pursuing Series A funding.

*Jansen used his position at the Company to sabotage Assure's Series A funding round led by HC9*

24. Throughout 2022 and 2023, Assure believed it had managed to maintain a good relationship with Jansen; Jansen closely followed Assure's successes and would periodically congratulate Assure's executives on their company's growth.

25. Behind the scenes, though, Jansen was apparently so incensed that Assure had rebuffed his pay-to-play scheme that he set out to destroy Assure. Beginning in April 2023, Jansen began making demonstrably false and defamatory claims to venture capital firms and other key players in the industry to sabotage Assure's Series A fundraising round and destroy its business

relationships, reputation, and prospects for growth.

26. In April 2023, Assure signed a term sheet with a venture capital firm, HC9 Ventures I, L.P. ("HC9"). Under the term sheet, HC9 committed to lead Assure's Series A financing with a specified valuation in the tens of millions of dollars.

27. As part of that commitment, HC9 facilitated introductions between Assure and other venture capital funds in its network. These funds pledged millions of dollars to participate in the Series A fundraising round and delegated due diligence to HC9.

28. HC9 conducted both substantive due diligence and confirmatory due diligence on Assure. The substantive due diligence effort involved the retention by HC9 of multiple third-party experts, including—notably—healthcare compliance efforts and healthcare attorneys from Fenwick & West LLP and an experienced physician executive. No healthcare compliance issues were raised during the substantive due diligence process, as evidenced by the progression of Assure to the final, confirmatory due diligence phase.

29. Importantly, HC9 was conducting due diligence (i) on its own behalf and for its own benefit; (ii) on behalf of the venture capital funds and other investors HC9 introduced to Assure, and which HC9 intended to include as co-investors in Assure's Series A; and (iii) on behalf of the venture capital funds and other investors Assure introduced to HC9, each of which had indicated its intention to participate in Assure's Series A, but each of which desired to delegate due diligence efforts to HC9 as the lead investor in the Series A, as is customary in such transactions.

30. As part of its final due diligence, HC9 asked to speak with Assure's client references, including the Company. Assure's COO called Jansen, who—after gushing about Assure's performance and his excitement for the Series A opportunity—volunteered to provide a positive client reference for Assure.

31. Then, during at least three separate calls with HC9, Jansen falsely claimed that the Company was going to imminently terminate its contract with Assure because Assure was committing widespread Medicare fraud and had major compliance issues.

32. He made those false claims during a phone call with HC9 on or around April 14, 2023. Then, later the very same day, during a second call to HC9 that Jansen himself initiated—unprompted by HC9—he repeated the same false claims.

33. HC9 informed Assure that even though Assure had passed all other confirmatory due diligence, Jansen's accusations were so alarming that HC9 had a fiduciary duty to its limited partners to terminate its agreement to invest in Assure and to lead its Series A.

34. On or around April 27, 2023, an Assure investor who had a relationship with Jansen reached out to him to inquire about Jansen's lies to HC9. Jansen backtracked on his false accusations and attempted to explain them away. At the investor's insistence, Jansen offered to do a "corrective" call with HC9. During that call, Jansen stated that he had checked with the Company's compliance team and admitted that there were no compliance issues with Assure, but he doubled down on the lie that the Company was going to imminently terminate Assure's contract.

35. Shortly thereafter, HC9 informed Assure that they had no choice but to terminate the investment agreement because of the accusations Jansen made about Assure.

*Jansen used his position at the Company to sabotage Assure's ability to secure investment from Maveron, LLC*

36. After destroying Assure's Series A, Jansen continued to spread the false accusations to destroy Assure's partnerships with other prospective investors and healthcare technology vendors.

37. Maveron, LLC ("Maveron") had demonstrated substantial interest in investing in Assure. Within 2-3 days of first reaching out, Maveron coordinated three partner meetings with

Assure, a highly accelerated timeline of engagement relative to the typical venture capital process.

38.     A Maveron partner then reached out to Jansen to inquire about Assure's work with the Company.  During that call, Jansen falsely claimed that Assure was committing Medicare fraud and had major compliance issues.

39.     After the call with Jansen, Maveron went from being extremely responsive and interested in Assure to not replying to any of Assure's emails about moving forward with an investment agreement.

40.     When Maveron finally replied to Assure, it was to let Assure know that Maveron was passing on the opportunity to invest in Assure.

### *Jansen used his position at the Company to sabotage Assure's business relationship with ELLKAY*

41.     On information and belief, Jansen was also responsible for destroying a business partnership between Assure and a healthcare interoperability technology vendor called ELLKAY, LLC ("ELLKAY").

42.     Assure's JV partner, Higi, had a long-term contractual relationship with ELLKAY, whereby ELLKAY provided its interoperability technology services to Higi.

43.     As part of the JV, Higi provided ELLKAY's interoperability technology services to the JV.  These services were (and are) indispensable to the JV's provision of services to the Company, as they allow for data flow between the Company, the JV, the Practice, and patients of the Company and the Practice.  After Assure acquired Higi's interest in the JV, Higi and Assure agreed that Assure would independently contract with ELLKAY to allow for the continuation of services.

44.     Historically, Assure's CEO and COO had a fantastic personal and working relationship with the ELLKAY team, including with ELLKAY's VP of Interoperability, the

executive in charge of the relevant part of ELLKAY's business. Assure executives had spent hours with these ELLKAY team members at industry conferences, business events, and social outings.

45. In July 2023, while Assure's negotiations with ELLKAY over the continuation of services were ongoing, ELLKAY suddenly became entirely unresponsive with Assure. Countless emails, text messages, and phone calls from Assure regarding the contract with ELLKAY went unanswered.

46. Eventually, ELLKAY's VP of Interoperability returned Assure's COO's call, and informed him that ELLKAY chose not to continue working towards a contract for the continuation of services because an employee of the Company had informed ELLKAY that the Company was going to imminently terminate its partnership with Assure because it had major compliance concerns.

47. On information and belief, Jansen was the Company employee who made these false accusations.

### *Both Jansen and the Company knew their accusations were false*

48. Defendants' accusations are demonstrably false, and they knew that their accusations were false when they made them.

49. The Company never terminated—or intended to terminate—its contract with Assure because of Medicare fraud, compliance concerns, or otherwise.

50. At the same time Jansen using his position as a Company employee to sabotage Assure, members of the Company's executive team confirmed that Assure was in good standing with the Company and that there were no compliance concerns:

    a. On April 24, 2023, the Company's Director of Finance, Karen Ross, provided Assure with a letter on the Company's letterhead confirming that Assure was in

9

good standing with the Company.

b. That same day, the Company's Director of Special Projects, Ceirra Hoch, who worked closely with Assure, called HC9 and similarly confirmed there were no compliance concerns with Assure and the that Assure was in good standing with the Company.

51. During that time, the Company and Jansen also celebrated and promoted the partnership with Assure, something they would not have done if they were about to terminate the contract or if Assure were having major compliance issues or committing Medicare fraud. For example, in April and May of 2023:

a. The Company's Chief Medical Officer, Dr. Michael Weiner, chastised members of the Company's executive team for not getting more patients enrolled with Assure because of the phenomenal clinical results that were being produced in partnership with the JV.

b. The Company boasted about the partnership with Assure on social media:



      c.   Jansen also trumpeted the success of the partnership on his LinkedIn page:



52.    A couple months later, the Company's Chief Medical Officer presented the clinical results of the Company's partnership with Assure at a health system conference that included the Mayo Clinic.

53.    In fact, long after sabotaging Assure, Jansen continued to boast about conceptualizing and leading the Company's collaboration with Assure in his Company biography:



11

{04221418 v1}

*The Defendants caused enormous and irreparable harm to Assure*

54. Defendants' false accusations ended Assure's business relationships with HC9, Maveron, ELLKAY, and possibly others, and destroyed Assure's ability to fundraise and operate.

55. As a result, the once-thriving company was left with no choice but to sell substantially all of its assets for $48.5 million less than what Assure had been valued at by HC9.

56. The parties previously entered into a tolling agreement to suspend the statute of limitations.

## COUNT ONE – DEFAMATION

57. Assure incorporates by reference the forgoing paragraphs and realleges them as if set forth fully herein.

58. Jansen, acting within the scope of his employment at the Company, repeatedly and falsely claimed that the Company was going to imminently terminate its contract with Assure because Assure was committing widespread Medicare fraud and had major compliance issues.

59. Jansen made those false statements repeatedly, including in three phone calls with HC9 starting on April 14, 2023.  He then repeated substantially the same false statements by making them to contacts at Maveron, ELLKAY, and possibly others.

60. Assure did not consent to Jansen's making false statements about Assure, nor did Jansen make the statements subject to any other legal privilege.

61. Jansen knew or recklessly disregarded that his statements were false, but he published and republished them anyway.  He did so out of malice and ill will toward Assure, born from Assure's having rebuffed his pay-to-play demands.

62. Jansen's statements are defamatory *per se* because they accuse Assure of criminal conduct (Medicare fraud and legal compliance failures) and are deeply injurious to Assure in its

business.

63. Assure has suffered harm as a direct result of Jansen's false and defamatory statements. That harm includes (i) the loss of millions of dollars in investments from HC9, from the venture capital funds HC9 had introduced to Assure and which had delegated due diligence to HC9, from the venture capital funds from which Assure had independently obtained investment intent and which had delegated due diligence to HC9, and from Maveron; and (ii) the loss of crucial interoperability services from ELLKAY and the loss of an ongoing business relationship with ELLKAY. Those harms wiped out $48.5 million in enterprise value and caused tens of millions in reputational harm and out-of-pocket expenses.

**COUNT TWO – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

64. Assure incorporates by reference the forgoing paragraphs and realleges them as if set forth fully herein.

65. Before Jansen made his false statements about Assure to HC9, Assure had a valid business relationship with HC9. That relationship was reflected in HC9's written agreement to lead Assure's Series A financing. Assure also had a valid expectancy of a continuing business relations with HC9, as reflected not only by HC9's valuation of Assure for the Series A financing, but also by HC9's work facilitating introductions between Assure and other venture capital funds in HC9's network, and by HC9's assurances that Assure had passed all of HC9's other confirmatory due diligence, so that, but for Jansen's false accusations, HC9 would have continued its relationship with Assure.

66. Before Jansen repeated his false claims about Assure to Maveron, Assure had a valid expectancy of a continuing business relationship with Maveron. That relationship was reflected in Maveron's demonstration of substantial interest in investing in Assure, including

13

Maveron's coordination of three partner meetings with Assure within just a few days of Maveron's initial outreach—an unusual degree of interest.

67. Before Jansen repeated his false claims about Assure to ELLKAY in July 2023, Assure, through the JV, had a valid business relationship with ELLKAY, which provided crucial interoperability technology services to the JV. Assure's long history and friendly relations with ELLKAY and its executives, along with ELLKAY's repeated offers to Assure to enter into a contractual business relationship with Assure and ELLKAY's enthusiastic pursuit of such a relationship, also gave Assure a valid expectancy of continuing its relationship with ELLKAY.

68. Jansen knew of Assure's relationships and/or expectancy of relationships with HC9, Maveron, and ELLKAY. Indeed, he spoke to those companies for the purpose of sabotaging Assure's relationships with them.

69. Jansen made his false claims about Assure to HC9, Maveron, and ELLKAY with the intent to interfere with Assure's relationships with those companies, so as to cause the termination of the existence or expectancy of those relationships. He did so out of ill will toward Assure.

70. Because of Jansen's false claims about Assure, HC9, Maveron, ELLKAY, and likely other third parties ceased developing or maintaining their relationships with Assure, causing Assure to lose out on tens of millions of dollars in investments and also on the interoperability services ELLKAY had provided that were vital to the JV. That wiped out $48.5 million in enterprise value and caused tens of millions in reputational harm and out-of-pocket expenses.

## PRAYER FOR RELIEF

WHEREFORE, Assure respectfully requests that the Court:

    i.    Award Assure compensatory damages of not less than $97 million;

    ii.    Award Assure attorney fees incurred in this action;

    iii.    Award Assure pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Assure hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Date:   May 1, 2025

/s/ Jesse L. Roth
Jesse L. Roth, Bar No. P78814
MADDIN HAUSER ROTH & HELLER, PC
One Towne Square, Fifth Floor
Southfield, MI 48076
Telephone: (248) 351-7010
Email: jroth@maddinhauser.com

Megan L. Meier (*Pro Hac Vice* Forthcoming)
Shannon B. Timmann (*Pro Hac Vice* Forthcoming)
MEIER WATKINS PHILLIPS PUSCH LLP
919 18th Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 318-3655
Email: megan.meier@mwpp.com
Email: shannon.timmann@mwpp.com

*Counsel for Plaintiff*