UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AHC HOLDINGS, INC.,

     Plaintiff,

                                   Case No. 1:25-cv-503

v.

                                   Hon. Paul L. Maloney

MSU HEALTH CARE, INC., et al.,

     Defendants.

_____/

## OPINION

There are two motions to dismiss before the Court. The first one (ECF No. 17) is from Defendant MSU Health Care. The second one (ECF No. 19) is from Defendant Roger Jansen. For the following reasons, the Court will deny and grant the motions in part.

## I. BACKGROUND

AHC Holdings (Assure), formerly known as Assure Health Corporation, is a medical technology company that helps physicians remotely monitor their patients' health. In April 2021, Assure's subsidiary, Assure Health Ventures, entered a joint venture with Higi Health Holdings (Higi). The joint venture was called Higi Health but was later renamed to Assure Health Care Everyday.

In June 2021, Assure started negotiations with MSU Health Care, which included Roger Jansen, MSU Health Care's Chief Strategic Growth and Digital Health Officer. During the negotiations, Jansen made repeated requests for some combination of

compensation, commission, or equity.  Assure ultimately declined these requests because it believed they were illegal.

In March 2022, the joint venture finalized an agreement with MSU Health Care. Assure then bought Higi Health Holdings's stake in the joint venture, giving it full ownership of the joint venture through Assure's subsidiaries.  Assure then began to attract the attention of venture capital firms interested in pursuing Series-A funding.

In April 2023, Assure signed a term sheet with a venture capital firm, HC9 Ventures I.  Under the term sheet, HC9 would lead Assure's Series A financing, meaning that HC9 would perform due diligence on behalf of itself and other potential investors before investing in Assure.  As part of its final due diligence, HC9 wanted to speak with a reference from MSU Health Care.  Assure's COO contacted Jansen, who offered to give a positive reference.

Jansen's reference was not positive.  Although he had spoken highly of Assure publicly, he was still upset about being denied any form of compensation or equity in Assure. So in April 2023, Jansen told HC9 that MSU Health Care was going to cancel its contract with Assure because Assure had committed widespread Medicare fraud and it had had other major compliance issues.  Jansen repeated similar accusations on multiple calls with HC9. Shortly after his last call, HC9 canceled its investment agreement with Assure.

But Jansen did not end there.  He told another potential investor, Maveron, the same story about Medicare fraud, compliance issues, and MSU Health Care's intention to cancel the contract.  Before talking to Jansen, Maveron was eager to invest in Assure.  Maveron had coordinated three partner meetings in the first few days of reaching out, an accelerated

timeline in the world of venture capital.  After Maveron spoke to Jansen, however, it stopped responding to Assure's emails and, ultimately, declined to invest at all.

Jansen then repeated his story to ELLKAY.  ELLKAY is a healthcare interoperability technology vendor.  Higi Health Holdings had contracted with ELLKAY to provide ELLKAY's services to the joint venture, which were essential for the joint venture's success. When Assure bought Higi's interest in the joint venture, Higi and Assure agreed that Assure would independently contract with ELLKAY to continue to receive ELLKAY's services. But while Assure was negotiating with ELLKAY, it stopped responding to Assure's messages. An executive from ELLKAY later called an executive with Assure to explain that an employee from MSU Health Care had told him that Assure was in bad standing with MSU Health Care due to major compliance concerns.

Jansen's accusations about fraud, compliance, and MSU Health Care's intent to cancel the contract with Assure were false.  These false accusations destroyed Assure's ability to fundraise and operate, so Assure eventually sold its assets at less than it had been valued at by HC9.

But before Assure decided to sue Jansen or MSU Health Care, it entered into a series of tolling agreements with them to give the parties an opportunity to settle any potential claims without litigation.  The parties signed the first two agreements separately in April 2024.  They then signed agreements in September 2024 and January 2025.  This lawsuit followed in May 2025.

Assure sued Jansen and MSU Health Care for defamation and tortious interference with a business relationship.  MSU Health Care and Jansen filed motions to dismiss Assure's

complaint (ECF Nos. 17, 19) and briefs in support of their motions (ECF Nos. 18, 20). Assure filed a response (ECF No. 22), and Defendants filed separate replies (ECF Nos. 23, 24).

## II. LEGAL STANDARD

A party may assert a defense for "failure to state a claim" through a motion to dismiss under Rule 12(b)(6). A motion to dismiss "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). So to survive the motion, the plaintiff's complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If more than one reasonable inference can be drawn from an allegation, the Court construes the facts "in the light most favorable to the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The Court cannot dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). The Court must ignore any legal conclusions that are unsupported by factual allegations. *Iqbal*, 556 U.S. at 678.

# III. ANALYSIS

## A. Vicarious Liability

Assure argues that MSU Health Care is vicariously liable for Jansen's actions. It argues that two theories of vicarious liability apply here: respondeat superior and ostensible agency. Each theory is considered below in turn.

### 1. Respondeat Superior

"An employer is generally liable for the torts its employees commit within the scope of their employment." *Hamed v. Wayne Cnty.*, 803 N.W.2d 237, 244 (Mich. 2011). The Michigan Supreme Court has defined "within the scope of employment" to mean "'engaged in the service of his master, or while about his master's business.'" *Id.* (quoting *Barnes v. Mitchell*, 67 N.W.2d 208, 210 (Mich. 1954)).

An employee is "within the scope of employment" when his conduct "is actuated, at least in part, by a purpose to serve the master."[1] *Matouk v. Michigan Mun. League Liab. and Prop. Pool*, 907 N.W.2d 853, 861 (Mich. App. 2017) (quoting RESTATEMENT (SECOND) OF AGENCY § 228(1)(c) (A.L.I. 1958)). An employee is outside the scope of employment "for torts intentionally or recklessly committed" that are "beyond the scope of his master's business." *Rogers v. J.B. Hunt Transport, Inc.*, 649 N.W.2d 23, 651 (Mich. 2002); *see also* RESTATEMENT (SECOND) OF AGENCY § 231 (A.L.I. 1958) ("An act may be within the scope of employment although consciously criminal or tortious."). And an employee that "could *only* be construed as an attempt to accomplish [the employee's] own

---

[1] The Second Restatement of Agency also requires here that the employee's conduct "is of the kind he is employed to perform" and "occurs substantially within the authorized time and space limits." RESTATEMENT (SECOND) OF AGENCY § 228(1)(b)-(c) (A.L.I. 1958). Assure's complaint satisfies these elements.

purpose," is outside the scope of employment too.  *Green v. Shell Oil Co.*, 450 N.W.2d 50, 53 (Mich. App. 1989) (emphasis added).

Jansen was MSU Health Care's Chief Strategic Growth and Digital Health Officer. Assure alleges that it was his responsibility to lead strategic initiatives, which included communicating about those initiatives.  It also alleges that Jansen's comments about canceling MSU Health Care's contract with Assure were within the scope of his employment:

> Standing in isolation, Jansen's false accusation of Medicare fraud, major compliance issues, and major compliance concerns might have undermined [MSU Health Care's] interests by communicating that [MSU Health Care] condoned such crimes.  So, . . . Jansen paired those false allegations with the false allegation that [MSU Health Care] was going to terminate its contract because of the alleged Medicare fraud and other misconduct alleged.

(1st Am. Compl. ¶ 71, ECF No. 15.)

In its motion, MSU Health Care argues that Jansen was motivated by his own personal reasons for making the alleged statements.  The complaint says as much: "Jansen was so incensed that Assure refused to join the pay-to-play scheme" that he lied "to venture capital firms and other key players in the healthcare industry."  (*Id.* ¶ 1.)  To support its argument, Jansen cites a Sixth Circuit case applying Michigan law, *Ryniewicz v. Clarivate Analytics*, 803 F. App'x 858 (6th Cir. 2020).  In *Ryniewicz*, an employee sued her ex-employer on the theory that her supervisor made defamatory comments while in the scope of his employment.  *Id.* at 869.  Jansen argues that the panel in *Ryniewicz* dismissed the complaint because the supervisor's comments were based on "personal motives, not employer directives."  (MSU Health Care Brief Mot. to Dis. 9.)  But the panel dismissed the defamation claim for more serious defects, including plaintiff's failure to allege facts to show

that the supervisor was actually in the scope of his employment at the time the comments were made. *Ryniewicz*, 803 F. App'x at 869.

Unlike the plaintiff in *Ryniewicz*, Assure alleges sufficient facts here to support the inference that Jansen was acting in the scope of his employment with MSU Health Care. Although it might be true that Jansen had a personal vendetta against Assure, the facts also support an inference that Jansen acted, "at least in part, by a purpose to serve the master." *Matouk*, 907 N.W.2d at 861. And at this stage, all inferences must be construed in a light most favorable to the plaintiff. As a result, Assure has alleged sufficient facts to hold MSU Health Care liable for Jansen's statements.

### 2. Ostensible Agency

In the alternative, Assure argues that Jansen acted with apparent authority, which is also sometimes called ostensible agency by Michigan courts. To establish a claim based on ostensible agency, a plaintiff must allege:

> [First] The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; [second] such belief must be generated by some act or neglect of the principal sought to be charged; [third] and the third person relying on the agent's apparent authority must not be guilty of negligence.

*Markel v. William Beaumont Hosp.*, 982 N.W.2d 151, 152 (Mich. 2022) (brackets in original). MSU Health Care argues that, although ostensible agency could exist here, it cannot be supported by intentional torts done for personal gain. It does not elaborate on how this argument works in the agency context. And while its argument might be true in certain factual situations, it is not apparently the case here.

In its complaint, Assure alleges that MSU Health Care advertised Jansen in his company biography as the one responsible for strategic initiatives, large-scale change, and innovation efforts. (1st Am. Compl. ¶ 58.) He alleges that HC9, Maveron, and ELLKAY relied on these representations because they decided to cut ties with Assure after hearing what Jansen had to say. (*Id.* ¶¶ 38, 44, 51.) It is not clear from the facts alleged that HC9, Maveron, and ELLKAY were negligent for doing so. And so Assure has alleged sufficient facts to hold MSU Health Care liable through Jansen as its ostensible agent.

Still, MSU Health Care argues that Assure is relying on the aided-by-agency-relation exception that was rejected by the Michigan Supreme Court in *Zsigo v. Hurley Med. Ctr.*, 716 N.W.2d 220 (Mich. 2006). The aided-by-agency-relation exception held employers responsible for the acts of their employees when the employee "purported to act or to speak on behalf" of their employer "and there was reliance upon apparent authority," or the employee "was aided in accomplishing the tort by the existence of the agency relation." *Id.* at 223-24. In rejecting this exception, the Michigan Supreme Court noted that an employee would be "always 'aided in accomplishing' [a] tort" because "the exception is not tied to the scope of employment but, rather, to the existence of the employment relation itself." *Id.* at 226.

The Michigan Supreme Court's rationale in *Zsigo* does not support a lack of ostensible agency here, however. Although the Michigan Supreme Court rejected an exception to vicarious liability in that context, it continued to recognize ostensible agency or

apparent authority in other contexts.[2]  *E.g., Markel,* 982 N.W.2d at 152; *see also Mais v. Allianz Life Ins. Co. of N.A.,* 34 F. Supp. 3d 754 (W.D. Mich. 2014) (rejecting the use of *Zsigo* in employment law contexts).  This Court does the same here.  Assure has alleged sufficient facts to support a theory of ostensible agency, and so this theory also survives MSU Health Care's motion to dismiss.

### B. Defamation

#### 1. Statute of Limitations

##### (a) Breach of Tolling Agreements

Jansen and MSU Health Care argue that they are excused from performance under the tolling agreements because Assure materially breached those agreements when the joint venture sued over unpaid invoices in July 2024 and then Assure itself filed an amended complaint in October 2024.  Assure argues that the invoice litigation did not materially breach either tolling agreement, and so the statute of limitations for its defamation claim was tolled.

The tolling agreements are referenced in the complaint and are central to Assure's defamation claims.  (1st Am. Compl. ¶¶ 63-68.)  The Court may rely on these agreements at the motion-to-dismiss stage as though they were part of the complaint.  *Greenberg v. Life Ins. Co. of Va.,* 177 F.3d 507, 514 (6th Cir. 1999).  And when "the allegations in the

---

[2] MSU Health Care insists that *Zsigo* was an exception formed within principal-agent relationships, but *Zsigo* itself seems more concerned with employer-employee relationships.  Over and over, the Michigan Supreme Court in that case referenced the "scope of employment" and "respondeat superior."  *Zsigo,* 716 N.W.2d at 226.  And although MSU Health Care rightly notes that the aided-by-agency-relation exception itself comes from the Second Restatement of *Agency,* the section of the restatement that it comes from discusses the liability of *masters* for the acts of their *servants* acting within the scope of their *employment.  Id.* at 222.  And so, *Zsigo* is mentioned here only to the extent that it may affect principal-agent relationships.

complaint affirmatively show that [a] claim is time-barred" it is appropriate for the court to dismiss the claim at the motion-to-dismiss stage. *Lutz v. Chesapeake Appalachia, L.L.C.,* 717 F.3d 459, 464 (6th Cir. 2013).

"Although typically courts are limited to the pleadings when faced with a motion under Rule 12(b)(6), a court may take judicial notice of other court proceedings without converting the motion into one for summary judgment." *Buck v. Thomas M. Cooley L. Sch.,* 597 F.3d 812 (6th Cir. 2010). The Court in this case takes judicial notice of the invoice litigation and the indisputable actions taken in that case. *See Rogers v. Webstaurant Store, Inc.,* 774 F. App'x 278, 282 (6th Cir. 2019).

The statute of limitations for a defamation claim is one year. Mich. Comp. Laws § 600.5805(11). The tolling agreements purported to extend the statute of limitations without reviving any claims that had already expired. The first two tolling agreements were signed before Assure's earliest defamation claim expired. The next two tolling agreements were signed before the previous agreement ended. None of the agreements purported to revive any claims already expired. So, Defendants argue, if the invoice litigation violated the tolling agreements, Assurance's defamation claim would have expired. Whether this is true or not is a matter of contract interpretation.

"The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate." *Shay v. Aldrich,* 790 N.W.2d 629, 637 (Mich. 2010). "The language of a contract" is "construed according to its plain meaning" unless it is ambiguous. *Id.* If the language is ambiguous, courts applying Michigan law may rely on extrinsic evidence to determine the parties' intent. *Id.*

There are two kinds of ambiguity: patent and latent.  *City of Grosse Pointe Park v. Michigan Mun. Liab. and Prop. Pool*, 702 N.W.2d 106 (Mich. 2005).  "A patent ambiguity is one 'that clearly appears on the face of a document, arising from the language itself.'"  *Id.* (internal quotation marks omitted).  "A latent ambiguity, however, is one that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed."  *Id.* (internal quotation marks omitted).

In this case, the language in each of the four tolling agreements is nearly identical. For example, the first two agreements, signed separately by Defendants, have the same non-litigation provision as the other two.  That provision says that "[d]uring the Tolling Period, the Parties shall not institute litigation against any other party asserting any claim."  (MSU Health Care Brief Mot. to Dis. Ex. 1 2.)  MSU Health Care and Jansen argue that the term "any claim" includes the claims in the invoice litigation.

In response, Assure argues that the parties intended to limit "any claim" to mean only claims for defamation and tortious interference with business relations.  If that were true, then the invoice litigation would not amount to a breach.  To support its argument, Assure cites this particular recital:

> WHEREAS, Assure believes that Roger Jansen, Chief Innovation and Digital Health Officer for [MSU Health Care], published various statements that are false, defamatory, disparaging, and otherwise injurious toward Assure, and unlawfully interfered with Assure's business relationships.

(*Id.* at 1.)

The language in this recital is not strong enough to create a patent ambiguity with the term "any claim" as it appears in the non-litigation provision.  The word "any" refers to every

or all claims. *See Clark v. Feinman*, No. 324258, 2016 WL 620142, at *2 (Mich. App. Feb. 16, 2016) (citing RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY (2000)). And while the recital cited by Assure does describe the purpose of each tolling agreement, it only addresses Assure's belief. What Assure "believes" is not as strong as its obligation in the non-litigation provision to refrain from "institut[ing] litigation . . . asserting any claim." *See Embers Inn & Tavern Property Group, LLC v. Mackinac Island Ferry Co.*, No. 364978, 2023 WL 9015066, at *2-3 (Mich. App. Dec. 28, 2023) (explaining that one party's "desire" described in a recital was not enough to trounce the grant of an easement elsewhere in the contract). In other words, the recital at issue does not constitute a promise that Assure will only refrain from bringing the claims that it tries now to bring here. *See McGuffin v. Sturdevant*, No. 240661, 2003 WL 22301054, at *2 (Mich. App. Oct. 7, 2003) (finding that the "whereas" clause did not constitute as separate promise overriding the language in a settlement agreement). So the language here is not ambiguous unless there is some latent ambiguity.

"A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings." *Shay v. Aldrich*, 790 N.W.2d 629, 641 (Mich. 2010) (internal quotation marks omitted). In this analysis, the parties' intent "must prevail" even against "the literal meaning of expressions used in the agreement." *W.O. Barnes Co. v. Folsinski*, 60 N.W.2d 302, 306 (Mich. 1953).

Here, Defendants formed a second tolling agreement even after the invoice litigation began in July 2024. And after Assure filed an amended complaint in October, the parties

again signed another tolling agreement in January of the following year.  The purpose of each agreement was the same: to help the parties "preserve the status quo to explore whether a resolution is possible prior to litigation."  (MSU Health Care Brief Mot. to Dis. Ex. 1 1.) Indeed, the purpose of tolling agreements in general is to allow for this type of exploration among parties.  The parties' behavior would thus be contrary to the idea that the invoice litigation resulted in a breach in the agreements.  As a result, for the purposes of this litigation, the term "any claim" is ambiguous.

The contract here is similar to the one in *Shay*.  In that case, the Michigan Supreme Court held that the term "any person" in a settlement agreement was ambiguous, and it used extrinsic evidence to construe the term to only refer to one set of officers liable for assault— not to another, separate set of officers that were part of the same incident.  *Shay*, 790 N.W.2d at 643 (Mich. 2010).  In this case, the parties will have an opportunity to develop extrinsic evidence through discovery.  But for now, the ambiguity of "any claims" in the tolling agreement is enough for Assure's defamation claim to survive Defendants' motions to dismiss.

### (b) Tolling of Claims Against Jansen

Jansen argues that the tolling agreements do not apply to Assure's defamation claim against him because Jansen signed the first agreement in his individual capacity and the second agreement in his official capacity.  Assure relies on various principles of contract interpretation to argue that Jansen is bound by the tolling agreement.

Michigan courts have explained that, when contracting parties wish to ensure that a corporate officer is bound in both an individual and an official capacity, "the nearly universal

13

practice is that the officer signs twice—once as an officer and again as an individual." *Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 742 N.W.2d 140, 146 (Mich. Ct. App. 2007) (per curiam). Following that practice strongly supports a conclusion that the signatory is bound in both capacities. *See, e.g., Lexon Ins. Co. v. Naser*, 781 F.3d 335, 340-41 (6th Cir. 2015) (concluding that an individual who signed a contract once as CEO and once with his social security number was bound in his individual capacity).

When the signatory signed only once, Michigan courts apply normal contract law principles to discern the parties' intent. Michigan courts presume that when "appropriate words added to the signature of [the individual] indicated that he signed on behalf of the corporation in the representative capacity designated," the individual is not bound in his personal capacity. *Wright v. Drury Petroleum Corp.*, 201 N.W. 484, 485 (1924). But that presumption may be rebutted: "Where anything on the face of the paper suggests a doubt as to the party bound, or the character in which any of the signers had acted in affixing his name, testimony may be admitted between the original parties to show the true intent." *Armstrong v. Andrews*, 67 N.W. 567, 568 (1896) (citation omitted).

In this case, Jansen only signed each tolling agreement only once. In July 2024 he signed the tolling agreement once with only his name—no title:



(Jansen Brief Mot. to Dis. Ex. A 3.)  In the September 2024 tolling agreement, Jansen signed with his title alongside a separate signature from MSU Health Care:



(Jansen Brief Mot. to Dis. Ex. B 3.)   And in the January 2025 tolling agreement, Jansen signed again with his title, but this time as a former employee:



(MSU Health Care Brief Mot. to Dis. Ex. 3 3.)

Jansen argues that he signed the first tolling agreement in his individual capacity, but, because he included his title in the signature of the second agreement, he was only bound by the second agreement in his official capacity.  As a result, he argues, Assure's defamation claim against him in his official capacity expired after he signed the first agreement, and Assure's defamation claim against him in his individual capacity expired after he signed the second agreement.

Assure does not argue that Jansen's first signature was not in his individual capacity. Instead, he argues that the Court should look at the parties' intent and other contract principles to determine that the second and third tolling agreements continued to bind Jansen to the tolling agreement.  Assure does not specify in which capacity—corporate or individual—that it would like to sue Jansen.  So to understand whether Jansen is bound in any capacity, the Court assesses each signature one by one.

In Jansen's first tolling agreement, he signs his name without any reference to his title. Thus, there is no presumption that he signed in his corporate capacity. At the beginning of the contract, Jansen is introduced without reference to his title. The relevant paragraph says:

> This Tolling Agreement ("Agreement") . . . is entered into by and between Assure Health Corporate and Assure Health Care Every Day, LLC (collectively "Assure") on the one hand, and Roger Jansen ("Jansen") on the other.

(Jansen Brief Mot. to Dis. Ex. A 3.)  Each reference to Jansen after the fact does not refer to his role as Chief Strategic Growth and Digital Health Officer. Based on the language and signature of the first agreement, the parties intended to bind Jansen in his individual capacity. Whether he continued to be bound in that capacity depends on whether he signed subsequent contracts in his individual capacity too.

In the second and third tolling agreements, Jansen signs his name with reference to his title. In the third agreement, Jansen's title now specifies that he is the *former* Chief Innovation and Digital Health Officer. Although the inclusion of a title normally creates a presumption that the parties intended to bind Jansen in his official capacity, there is a second signature from MSU Health Care in the final two agreements. References to Jansen in the contract's recitals include references to his title, but they also separately refer to MSU Health Care as also being bound. The recitals also acknowledge Assure's belief in valid claims "against [MSU Health Care] and Jansen"—referring again to the Defendant separately.

Michigan courts "interpret a contract in a way that gives every word, phrase, and clause meaning, and must avoid interpretations that render parts of the contract surplusage." *Klapp v. United Ins. Group Agency Inc.*, 663 N.W.2d 447, 453 (2003). If the Court were to read

Jansen's signature as binding MSU Health Care, that would create surplusage of the signature listed under MSU Health Care.  Thus, the parties may draw on any other evidence to determine whether Jansen signed the second and third tolling agreements in his official or individual capacity.  The parties will have an opportunity to develop this evidence during discovery.  But for now, Assure has stated sufficient facts to allege that Jansen was bound by the tolling agreements.

### 2. Sufficiency of the Allegations

#### (a) Pleading Standard

The parties disagree whether the federal pleading standard or Michigan's heightened pleading standard applies to this case.  Michigan courts require the elements of a defamation claim to "be specifically pleaded, including the allegations with respect to the defamatory words, the connection between the plaintiff and the defamatory words, and the publication of the alleged defamatory words." *Gonyea v. Motor Parts Fed. Credit Union*, 480 N.W.2d 297, 298 (Mich. App. 1991).  The Michigan Court of Appeals routinely applies this standard. *See, e.g., Ledl v. Quik Pik Food Stores, Inc.*, 349 N.W.2d 529, 489 (Mich. App. 1984); *Pursell v. Wolverine-Pentronix, Inc.*, 205 N.W.2d 504, 507 (Mich. App. 1973); *Thomas M. Cooley L. Sch. v. Doe 1*, 833 N.W.2d 331, 341 (Mich. App. 2013).  The Supreme Court of Michigan has never applied the heightened pleading standard in this way except in a concurring opinion. *Rouch*, 487 N.W.2d 205, 220 (Riley, J., concurring) (citing *MacGriff v. Van Antwerp*, 41 N.W.2d 524, 526 (1950)).  But even assuming that the Michigan Supreme Court would apply the heightened pleading standard to a defamation claim, federal courts are not necessarily bound to follow it.

The Rules of Decision Act "dictates that state substantive law must yield if the Constitution, a treaty, or a statute 'otherwise require[s] or provide[s].'" *Berk v. Choy*, No. 24-440, 2026 WL 135974, at *3 (U.S. Jan. 20, 2026) (quoting 28 U.S.C. § 1652). The Rules Enabling act "authorizes the Supreme Court to adopt uniform rules of procedure for district courts" and "provides for the application of federal law." *Id.* (citing 28 U.S.C. § 2072). So a valid Federal Rule of Civil Procedure "displaces contrary state law." *Id.*

The Federal Rules of Civil Procedure displace state law when a Federal Rule "answers the question in dispute." *Id.* (quoting *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010)). If a Federal Rule answers the disputed question, it governs, unless it "exceeds statutory authorization or Congress's rulemaking power." *Id.* (quoting *Shady Grove*, 559 U.S. at 398.)

In this case, the question of a pleading standard is addressed in Rules 8 and 9 of the Federal Rules of Civil Procedure. Defendants do not argue that either one of these rules exceeds statutory authorization. Instead, they point to unpublished cases where federal courts have applied Michigan's heightened pleading standard to a defamation case. *See Ryniewicz v. Clarivate Analytics*, 803 F. App'x 858, 867 (6th Cir. 2020); *Bhan v. Battle Creek Health Sys.*, 579 F. App'x 438, 446 (6th Cir. 2014); *Fox v. Kitch, Drutchas, Wagner, Valitutti and Sherbrook P.C.*, No. 07-10240, 2008 WL 11626313, at *8 (E.D. Mich. Feb. 6, 2008); *Davis v. Med-1 Occupational Health Services*, No. 1:23-CV-426, 2023 WL 5533498, at *5 (W.D. Mich. Aug. 3, 2023), *R. & R. approved*, No. 1:23-CV-426, 2023 WL 5529782 (W.D. Mich. Aug. 28, 2023). In response, Assure cites to opinions from this Court and the Sixth Circuit applying the standard under the Federal Rules. *See LaRue v. Mortg. Elec.*

*Registration Sys., Inc.*, No. 1:12-CV-68, 2012 WL 3886876, at *4 (W.D. Mich. Sept. 6, 2012); *Armstrong v. Shirvell*, 596 F. App'x 433, 459 (6th Cir. 2015).  Jansen acknowledges in his reply that the Sixth Circuit does not provide a clear answer on whether to apply Michigan's pleading standard.  (Jansen Reply 15.)  And although precedent is sometimes helpful, none of the cases that the parties cite discuss the rationale behind their decision to apply (or not to apply) Michigan's heightened standard.

In its reply, MSU Health Care argues that choosing not to apply Michigan's heightened pleading standard would lead to forum shopping and create different results in state and federal courts.  (MSU Health Care Reply 9.)  These considerations are the "twin aims of the Erie rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws."  *Hanna v. Plumer*, 380 U.S. 460, 468 (1965).  But the Erie rule does not come into play here because the Rules of Decision and Rules Enabling Acts allow the Rules of Civil Procedure to skip this analysis altogether.  *Berk*, 2026 WL 135974, at *3.  Thus, the Federal Rules of Civil Procedure apply here.

### (b) Failure to State a Claim under Rule 12(b)(6)

To state a claim for defamation, a plaintiff must allege:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm [defamation per se] or the existence of special harm caused by publication [defamation per quod].

*Rouch v. Enquirer & News of Battle Creek Mich.*, 487 N.W.2d 205, 211 (Mich. 1992) (citation modified).

To satisfy Rule 8, a plaintiff must plead only "sufficient factual matter, [when] accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). If a plaintiff pleads special damages, "[they] must be specifically stated" under Rule 9(g). Defamation and libel claims under Michigan law require such special damages except in cases of defamation per se. *See Mitan v. Campbell*, 706 N.W.2d 420 (Mich. 2005). An accusation of a crime, like Medicare fraud, is defamation per se. *Kevorkian v. Am. Med. Ass'n*, 602 N.W.2d 233, 237 (Mich. App. 1999). Here, Assure alleges both defamation per quod and defamation per se.[3] (1st Am. Compl. ¶¶ 75-76.)

Assure alleges sufficient facts to satisfy all four elements of defamation under Rule 8. It alleges that Jansen made false statements about it on three different occasions during conversations with a third party. It alleges that Jansen made these statements willfully despite knowing that they were false. And it alleges that its business suffered as a result.

Defendants argue that the alleged defamatory statements did not concern the plaintiff because Jansen's relationship with Assure was through MSU Health Care, which had a relationship with the joint venture—not Assure itself. But whether a statement concerns the plaintiff can be gleaned from context and what a third party might reasonably believe about a statement. *See Smith v. Fergan*, 450 N.W.2d 3, 4 (Mich. App. 1989) ("Because plaintiff was one of two employees towards whom the statement was directed, it is reasonable to

---

[3] In his reply, Jansen argues that, because Medicare fraud can also result in civil penalties, Assure was unable to allege defamation per se on the theory that it is also a crime, or at least that he would be limited in doing so. But the Court must accept Assure's characterization of Assure's statement about Medicare fraud as described in his complaint. And also, Jansen's argument was only brought up for the first time in a reply, so the Court does not need to address it. *Gantz v. Wayne Cnty. Sheriff's Off.*, 513 F. App'x 478, 481 n.4 (6th Cir. 2013).

conclude that the words were directed at plaintiff as a member of this group and were published in the presence of a third person."); *cf. Geomatrix, LLC v. NSF Intl.*, 82 F.4th 466 (6th Cir. 2023) (explaining how statements about a product in general do not concern a company that markets and sells a specific model of that product). And in Assure's complaint, it alleges that Jansen not only spoke about Assure but also that the third parties knew from context that each of Jansen's statements were made with reference to Assure and its business practices. (*See* 1st Am. Compl. ¶¶ 31-32 (regarding HC9), 40-41 (Maveron), 49-51 (ELLKAY).)

Assure also alleges sufficient facts to satisfy the fourth element of defamation under Rule 9 for damages per se. It specifically alleges that Jansen's statement "ended [its] business relationships with HC9, Maveron, ELLKAY, and possibly other others, and destroyed Assure's ability to fundraise and operate," forcing Assure to "sell substantially all of its assets for $48.5 million less than what Assure had been valued at by HC9." (1st Am. Compl. ¶¶ 61-62.) Rule 9(g) is meant to ensure that Defendants are promptly informed as to the nature of the damages claimed against them. It does not require a full accounting of those damages in the plaintiff's initial pleading. *See* 5A WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 1310 (4th ed. 2001). Assure's allegations here pass this threshold as set out in Rule 9.

### (c) Absolute Immunity from Consent Defense

Under Michigan law, "a publication is absolutely privileged if the defamed party invited or consented to the publication." *See Romero v. Buhimschi*, 396 F. App'x 224 (6th Cir. 2010) (collecting cases). "The privilege can be both express or implied." *Id.* (citing

*Ramsey v. Speedway SuperAmerica LLC*, No. 279034, 2008 WL 3541206 at *4 (Mich. Ct. App. Aug.14, 2008)).   "An absolutely privileged communication is not subject to a defamation claim even if the statement was false or malicious."  *Id.* (citing *Oesterle v. Wallace*, 725 N.W.2d 470, 474 (2006)).

In its complaint, Assure alleges that it relied on Jansen's positive statements about working with Assure when it provided him as a reference to HC9:

> 31. As part of its final due diligence, HC9 asked to speak with Assure's client references, including [MSU Health Care]. Assure's COO called Jansen, who—after gushing about Assure's performance and his excitement for the Series A opportunity—volunteered to provide a positive client reference for Assure's benefit, on behalf of [MSU Health Care], about the [its] experience with Assure.

> 32. In allowing Jansen to serve as a reference, Assure only gave him permission to make representations to HC9 regarding his impressions of the working relationship between Assure and [MSU Health Care]. And Assure's grant of permission to Jansen was given because, and in reliance upon, Jansen's representation to Assure that he was satisfied with Assure's performance and excited about the future of the partnership between Assure and [MSU Health Care].

(1st Am. Compl. ¶¶ 31-32.)

Many courts apply the privilege of consent when defamatory publications are sent as part of a review or investigatory process.  *Romero,* 396 F. App'x at 236 (collecting cases).  In one case, a volunteer with the sheriff's department gave the department permission to talk with her former employer about the reasons she was terminated.  *Ramsey v. Speedway SuperAmerica, L.L.C.*, No. 279034, 2008 WL 3541206, at *4 (Mich. App. Aug. 14, 2008). The Michigan Court of Appeals examined the signed release to determine whether the alleged defamatory statements were "relevant to the purpose for which consent was given." *Id.*  It held that the express terms of the release had done just that.  *Id.* at *5.  In another

case, the fact that plaintiff initiated an investigatory proceeding against the defendant meant that the plaintiff had impliedly consented for defendant to make allegedly defamatory statements to the investigators. *Romero,* 396 F. App'x at 236, 237 (collecting cases).

Like the plaintiffs in those cases, Assure had initiated an investigation by HC9 as part of HC9's due diligence for providing funding. Assure gave HC9 consent to speak to Jansen about MSU Health Care's experience with Assure. Here, however, Assure argues that the fact that it only gave Jansen consent to speak positively about his work with Assure means that it did not consent for him to say negative things. But Michigan case law is more focused on the nature of the consent between the defamed party (here, Assure) and the third-party interlocutor (HC9), not the consent between the defamed party and the defamer (Jansen). In this case, like in *Romero,* Assure initiated the due-diligence investigation through its business relationship with HC9. And although Assure seemed to agree with Jansen that he would only provide a positive reference, the agreement between the defamer and the defamed does not matter for the purposes of the absolute privilege of consent. This is the case even when the defamer's statements were malicious or false.

Jansen also argues that he enjoys the absolute privilege of consent with respect to the alleged statements he made to Maveron. Assure does not allege that it gave Maveron consent to contact Jansen, but Jansen argues that this fact should be inferred from the pleadings. But the Court at this stage must view all reasonable inferences from the facts alleged in a light most favorable to the non-moving party. And so the Court here must view the facts as alleged by Jansen here in a light most favorable to him. If Jansen believes that he actually did have

consent to speak to Maveron, he will have an opportunity to provide evidence to that end during discovery.

### C. Tortious Interference with a Business Relationship

#### 1. Statute of Limitations

Defendants argue that Assure's claim for tortious interference with business relations is an artful repleading of his defamation claim, designed to take advantage of tortious interference's three-year statute of limitations over defamation's one-year statute of limitations. But as described earlier, Assure's defamation claims were tolled as part of its agreements with Defendants. Even if the defamation claim had not been tolled, there is Michigan case law to support simultaneous claims for defamation and tortious interference. *See Wilkerson v. Carlo*, 300 N.W.2d 658 (Mich. App. 1980); *Kollenberg v. Ramirez*, 339 N.W.2d 176 (Mich. App. 1983); *see also PMP - Romulus, Inc. v. Valyrian Mach., LLC*, No. 2:23-CV-10822, 2024 WL 3646962, at *6 (E.D. Mich. Aug. 2, 2024). In light of Michigan law, Assure may proceed with both his defamation and tortious interference claims.[1]

#### 2. Sufficiency of the Allegations

The elements of tortious interference with a business relationship or expectancy are "the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant

---

[1] Jansen argues in his reply that *Wilkerson* and *Kollenberg* only support separate claims for defamation and tortious interference when the damages for each claim are independent of each other, which Assure fails to do. *See Kollenberg*, 339 N.W.2d at 179 ("When two torts overlap, the plaintiff may bring suit for both torts as long as damages are not duplicated."). But as discussed above, at least part of Assure's defamation claim is for defamation *per se*, meaning Assure pled a claim entitling him to damages that are separate from his recovery for tortious interference with a business relationship. *See Wilkerson*, 300 N.W.2d at 659. Also, because Jansen is protected by the absolute privilege of consent with respect to his conversation with HC9, Assure is unable to recover damages for that part of his defamation claim, but he may recover for tortious interreference.

inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff." *Cedroni Ass'n., Inc. v. Tomblinson, Harburn Associates, Architects & Planners Inc.*, 821 N.W.2d , 31 (Mich. 2012).

### (a) Existence of a Valid Business Relationship or Expectancy

The plaintiff must allege a business relationship or expectancy that is "a reasonable likelihood or probability, not mere wishful thinking." *Id.* "To demonstrate such a realistic expectation, Plaintiffs must prove an anticipated business relationship with an identifiable class of third parties." *Lucas v. Monroe Cnty.*, 203 F.3d 964, 979 (6th Cir. 2000) (citing *Schipani v. Ford Motor Co.*, 302 N.W.2d 307, 314 (1981)).

Michigan courts have held that when a business contract is set to expire, it is not reasonably likely to expect the relationship to continue. *Upper Peninsula Power Co. v. Vill. of L'Anse*, 965 N.W.2d 658, 670-671 (Mich. App. 2020). And, because hiring is highly discretionary, it is not reasonably likely to expect to be hired when one is a "a mere interviewee." *Ukpai v. Cont'l Automotive Sys., Inc.*, No. 350294, 2020 WL 7635448, at *2-3 (Mich. App. Dec. 22, 2020).

Assure argues that it was more than a mere interviewee with Maveron and ELLKAY. There is also nothing in their complaint to indicate that there was a deadline to their expectation with either company. Assure points instead to cases where federal courts have interpreted Michigan law on a motion to dismiss. In one case, the Sixth Circuit held that it was sufficient to allege a reasonable likelihood or probability by pleading a business relationship that would have existed but for tortious interference. *Lucas*, 203 F.3d at 979. District courts have followed the same approach at the motion-to-dismiss stage. *See, e.g.*,

*Saad v. Healthgrades Marketplace, LLC*, 788 F. Supp. 3d 809, 826 (E.D. Mich. 2024) (explaining that an allegation that potential patients were turned away from a doctor because of false reviews posted by defendant was sufficient); *AirPro Diagnostics, LLC v. Drew Techs., Inc.*, No. CV 22-12969, 2023 WL 11991504, at *6-7 (E.D. Mich. Sept. 21, 2023) (citing *Lucas*).

Assure alleges that Maveron "had demonstrated substantial interest in investing in Assure. Within 2-3 days of first reaching out, Maveron coordinated three partner meetings with Assure, a highly accelerated timeline of engagement relative to the typical venture capital process." (1st Am. Compl. ¶ 40.) It also alleges that Maveron had been "extremely responsive and interested in Assure" before Maveron partners spoke to Jansen. (*Id.* ¶ 42.) Based on these allegations and in light of the Court's obligation to draw inferences in a light most favorable to plaintiffs, Assure has successfully alleged the existence of a valid business expectancy with Maveron.

Assure alleges that its original joint-venture partner, Higi Health Holdings, "had a long-term contractual relationship with ELLKAY whereby ELLKAY provided its interoperability technology services" and Higi Health Holdings provided ELLKAY's services to the joint venture. (*Id.* ¶¶ 46-47.) ELLKAY serviced the joint venture until Assure acquired Higi Health Holdings's interest, and "Higi and Assure agreed that Assure would independently contract with ELLKAY." (*Id.* ¶ 47.) Assure also alleges that its chief executives "had a fantastic personal and working relationship" with ELLKAY's team, spending hours together "at industry conferences, business events, and social outings." (*Id.* ¶ 48.)

MSU Health Care argues that Assure lacks standing to assert a tortious interference claim based on its relationship with ELLKAY because, as Assure alleges, ELLKAY had a contract with the joint venture—not with Assure. Assure argues that it does not need standing under the contract; it only needs a business relationship or expectancy. Although Higi or the joint venture would have a strong business relationship based on their contract with ELLKAY, a contract is not necessary to establish a relationship or expectancy. *McDonald Ford, Inc. v. All Am. Ford, Inc.*, No. 239085, 2003 WL 21299922, at *2 (Mich. App. June 5, 2003). The facts alleged by Assure are sufficient at this stage to state a business relationship or expectancy with ELLKAY.

### (b) Knowledge of the Relationship or Expectancy

Assure alleges that Jansen knew about and was excited about the Series A funding opportunity with HC9. (1st Am. Compl. ¶ 31.) Assure alleges that Jansen was "put on notice that Maveron was interested in doing business with Assure" when "a Maveron partner reached out to Jansen to inquire about Assure's work" with MSU Health Care. (*Id.* ¶ 41.) Assure also alleges that "Jansen knew about Assure's relationship with ELLKAY" because he "was on multiple calls when this was discussed." (*Id.* ¶ 49.)

MSU Health Care argues that Assure only alleges that Jansen was aware of a "generalized business dealing" with ELLKAY, which is not sufficient. *See Varlesi v. Wayne State U.*, 909 F. Supp. 2d 827, 850 (E.D. Mich. 2012). In *Varlesi*, the plaintiff failed to allege that her alleged defamer knew about a promised job opportunity, and so the plaintiff argued that the defamer at least knew that her comments would affect plaintiff's job prospects in general. *Id.* at 839, 850. That situation is different from the facts alleged here. Here, Assure

28

has alleged sufficient facts to show that Jansen had specific knowledge of Assure's relationship with Maveron and ELLKAY.

### (c) Causation

Jansen argues that Assure does not allege sufficient facts to show that Jansen's comments to Maveron or ELLKAY caused a breach or termination of the relationship or expectancy. In the complaint, Assure alleges that, "[o]n information and belief, Maveron passed on the Assure investment as a direct result of the false and defamatory statements Jansen made about Assure to Maveron." (1st Am. Compl. ¶ 44.) Assure also alleges that an executive at ELLKAY told Assure that it "chose not to continue working towards a contract for a continuation of services because an employee of [MSU Health Care] told [him]" that Assure was in bad standing with MSU Health Care and that it would likely cancel its partnership with Assure over "major compliance issues." (*Id.* at ¶ 51.) That employee, Assure alleges, "[o]n information and belief," was Jansen. (*Id.* at ¶ 52.)

In his reply, Jansen argues that Assure's allegations of causation are only pled on information and belief, which is not enough at the motion-to-dismiss stage. "Although there is no express authorization in the federal rules for pleading on information and belief, allegations in this form have been held to be permissible, even after the *Twombly* and *Iqbal* decisions." *Cassidy v. Teaching Co., LLC*, No. 2:13-CV-884, 2014 WL 1599518, at *3 (S.D. Ohio Apr. 21, 2014) (quoting 5 WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1224 (3d ed. 2013)). "The *Twombly* plausibility standard . . . does not prevent a plaintiff from 'pleading facts alleged on information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual

information that makes the inference of culpability plausible." *Id.* (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir.2010) (internal citations omitted)).  District courts in the Sixth Circuit have reached a conclusion similar to the Second Circuit with respect to pleadings based on "information and belief."  *Id.*  (collecting cases.)

Assure's use of "on information and belief" is supported by an inference based on the facts otherwise alleged.  Thus, Assure has made sufficient allegations with respect to causation at this stage.

## IV. CONCLUSION

For the reasons provided, the Court will grant in part and deny in part Defendants' motions to dismiss (ECF Nos. 17, 19).

The Court will grant Defendants' motion with respect to Jansen's statements to HC9 as described in support of Assure's defamation claim.

For all other aspects of all other claims, the Court will deny Defendants' motions.

The Court will enter an order in accordance with this Opinion.


Date:  March 6, 2026                          /s/ Paul L. Maloney
                                              PAUL L. MALONEY
                                              UNITED STATES DISTRICT JUDGE